**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**COLLY CASCEN, Defendant**

Criminal No. SX-08-CR-474
Superior Court of the Virgin Islands
Division of St. Croix
August 31, 2011

350

351

352

KIPPY ROBERSON, ESQ.; CORNELIUS EVANS, ESQ., Assistant Attorneys General, Department of Justice, Christiansted, USVI, *For the Plaintiff.*

JOMO MEADE, ESQ., Law Offices of Jomo Meade, Frederiksted, USVI, *For the Defendant.*

BRADY, *Judge*

## MEMORANDUM OPINION

(August 31, 2011)

THIS MATTER is before the Court on Defendant's "Motion for Judgment of Acquittal or, in the Alternative Motion for a New Trial"; the People's Objection thereto; and Defendant's "Supplemental Motion for Judgment of Acquittal or, in the Alternative, Motion for A New Trial;" and

the People's Supplemental Objection thereto. The Court heard arguments on these Motions on June 28, 2010. In his Motions, Defendant seeks an acquittal or a new trial on the basis of a range of issues including jury bias, erroneous rulings by the Court, and prosecutorial misconduct. The Court will address these claims seriatim.

## I. FACTUAL BACKGROUND[1]

On or about September 7, 2008, a shooting occurred in the vicinity of the Harvey Housing Community in Estate Bethlehem. A Third Amended Information, containing six Counts, was filed on March 12, 2010.[2] The Defendant was charged with one count of First Degree Murder for the killing of Christian D. Soto, III., (Soto), one count of Attempted Murder of Cyril Peters (Peters or "Din Din"), one Count of Assault in the First Degree for the assault on Cyril Peters, one count of Assault in the Third Degree for the assault on W.J., a minor, one count of Reckless Endangerment and one count of Possession of an Unlicensed Firearm During The Commission Of A Crime of Violence.

The six (6) day trial began on March 8, 2010 and the jury heard testimony from fourteen (14) witnesses called by the People and ten (10) by the Defense. There were seventeen (17) exhibits which detailed the location of the incident and the persons involved. Among the fact witnesses called by the People were Christian Soto, Jr., a.k.a. "Dooly", the father of the deceased Soto; W.J., a minor; Jonathan Cepeda (Cepeda); and Yessenia Knowles (Knowles) all of whom gave their respective eyewitness accounts of the events. The first witness, W.J., was a minor at the time of the incident. He testified that it was evening time when the shooting took place. He noted that Leo Rodriguez (the owner of the horse that Soto rode to victory), Dooly, Cepeda and he were beginning to celebrate the race that Soto won earlier that day. Trial Tr. vol. 2, 30-32, Mar. 9, 2010. W.J. had just congratulated Soto on winning the race when he observed a black jeep coming into the area where they were gathered. W.J. then testified that soon after the black jeep appeared, he

---

[1] The facts presented herein were adduced through the evidence presented at Trial.

[2] An eight-count Information was originally filed October 1, 2008. The Second Amended Information was filed March 5, 2010. *See* Trial Tr. vol. 1, 10, Mar. 8, 2010. On March 12, 2010, in the Third Amended Information, two of the counts were removed by the People after Defense Counsel voiced his objection that they were multiplicitous.

heard shots being fired, and as a result, he ran in the direction of his home and did not look back. When asked if he had been injured, he stated he was grazed by a bullet on his back. He was taken to the hospital by ambulance and treated for his injuries. *Id.* at 32-38. W.J. testified that he did not see the shooter. *Id.* at 47.

The next witness was Christian D. Soto, Jr. (Dooly) who testified that on September 7, 2008, his son was killed in Harvey Project, Estate Bethlehem. Dooly explained that earlier in the day his son had participated in one of the horse races at the Randall "Doc" James Race Track and Stadium. The sixteen year-old Soto, having been victorious as the jockey of a winning horse, was celebrating. Soto and several other members of the community were drinking and talking after the races. In his testimony Dooly was able to identify the area using a diagram that he constructed to demonstrate where the individuals were located, as well as the positions of the vehicles at the time of the incident. A few minutes after Dooly arrived on the scene Peters also came into the area in a white Nissan Altima. Dooly began to have a conversation with Peters about the horse race. At one point Dooly realized that Peters was no longer paying attention to their conversation, so he went into the passenger side of his vehicle to retrieve some food. As he began to reach into his vehicle, he observed a small black truck, a Toyota Tacoma, approach the scene. *Id.* at 67. He further testified that "me and his eyes make four," meaning that he locked eyes with the Defendant. *Id.* at 69. Dooly then observed the Defendant jump out of the black pickup truck and repeatedly fire at Peters with a chrome handgun. *Id.* at 67-71. In his testimony Dooly positively identified the Defendant as the perpetrator from the witness stand. Dooly indicated he was very familiar with the Defendant because he and the Defendant lived in the same neighborhood. Dooly mentioned that he and the Defendant would have almost daily casual conversations. *Id.* at 70-79.

Dooly then began to describe the shooting incident again stating that as the Defendant, began to shoot after Peters, Peters fled the area with the Defendant chasing after him. Dooly, ducked into his car as the initial shots were fired, after which he raised his head up and began to look around the scene. As Dooly did so, he discovered that his son was lying next to his vehicle and had been shot in his head. Dooly gave his phone to a bystander to call for an ambulance. Dooly decided that the ambulance was not arriving fast enough so he tried to coax Knowles and Leo Rodriguez to take Soto to the hospital. Knowles, however, insisted on waiting for her

wounded boyfriend, Peters, to be helped into the car. Knowles assisted Peters into her car, and then she drove Peters, Soto and Dooly to the hospital. Trial Tr. vol. 2, 188, Mar 9, 2010. Peters' wounds were bleeding profusely onto the car fabric. People's Ex. No. 20-21.

Detective Dino Herbert (Detective Herbert) approached Dooly at the hospital to discuss the incident, but Dooly "didn't want to say anything." He did not tell the police who the shooter was because he "didn't trust in the police station." He decided to be more forthcoming with the authorities after he spoke by telephone with his brother in the states, who encouraged him to discuss the matter with the Attorney General's office. *Id.* at 92-94. Dooly was interviewed a second time by Detective Herbert who showed him a photo array in which Dooly identified the photo of the Defendant as the shooter in the September 7, 2008 incident. *Id.* at 97-98; *see also* Trial Tr. vol. 3, 10-13, Mar. 10, 2010. During his testimony, Dooly referred extensively to a diagram that he had drawn to illustrate the placement of the vehicles and the individuals involved in the shooting incident. *See* Trial Tr. vol. 2, 56-104, Mar. 9, 2010. He confirmed the photos that depicted two (2) bullet holes and their placement in Dooly's car (admitted as People's Ex. No. 1). Defense Counsel cross-examined · Dooly about his conversations at the hospital. Dooly said that Detective Herbert questioned him at the hospital, but in his statement he did not mention the name of the Defendant or the fact that he could identify the shooter. Dooly was very clear that he felt uncomfortable speaking with the police at that time. Defense Counsel then moved for the admission of Dooly's statement on September 8, 2008 as Def. Ex. No. 1.

Knowles was the next witness called by the People to testify about the incident. She acknowledged that she was Peters' girlfriend at the time and testified that she had rented the white Altima on the day of the incident. She noted that her boyfriend was driving the vehicle and that he picked her up where she was living in Williams Delight. She then began to drive in the direction of Harvey Housing Community (Bethlehem area) where Peters' sister resided. *Id.* at 170-175. Knowles went on to describe a large SUV, similar to a Chevrolet Equinox, following them with its lights off. After a few minutes of the car following them, Knowles made an abrupt turn at a corner, and then pulled over. Peters then switched places with her and drove to his sister's house. She stayed in the car while Peters retrieved some lasagna from his sister's house. When he got back in the car, Knowles told Peters she believed that the white SUV was still following

them. *Id.* at 176-179. As they approached the first speed bump in the project, she stated that a black truck stopped right beside them heading in the opposite direction. Then Peters parked where the people were celebrating Soto's win. She further testified that Peters was not paying attention to what Dooly was telling him and was looking into his rear view mirror. Knowles felt uncomfortable and requested that they leave the area. As she was speaking, she testified, she heard the first gunshot. *Id.* at 180-183. Peters got out of the car and began to run. She continued to hear shots, and shouted towards Peters to "run, run, run, run!" Knowles said she only saw the shooter from the back and, was not able to see who it was. After the shooting stopped she screamed for help, no one came and she began to drag the wounded Peters out of the bushes. *Id.* at 183-186.

The Prosecution tried to elicit a reason as to why the Defendant would have wanted to hurt Peters. She initially responded that she was only able to see the body language of the assailant and that it might have been a person named Dave from La Grange. *Id.* at 194-195. In response to the Prosecution's questions she indicated that Detective Herbert questioned her, coming to her place of work several times to ask if she saw the perpetrator. Knowles stated she continuously replied in the negative. It was only after she stated "yes she saw Colly" that he stopped questioning her. *Id.* at 211-213. Knowles acknowledged that she had a conversation with Special Agent Thomas Drummond (Agent Drummond) of the Federal Bureau of Investigation (FBI). After repeated questions Knowles told Detective Herbert that she named the Defendant because of "a pre-existing situation" with the Defendant and Din Din. *Id.* at 227. The Defendant told her that she should be "very careful being around [Peters] because a lot of people wanted to kill him." She further testified that Defendant told her "if Din Din come close to him to try to hurt him, he is gonna hurt [Din Din] or kill him." *Id.* at 228.

When called by the People, Cepeda was questioned about the incident and had a vague recollection of the events. He was unable to remember the date or time of the incident. He stated he was testifying against his will. Trial Tr. vol. 3, 118-123, Mar. 10, 2010. On the stand, Cepeda was very clear that he was unable to identify the shooter. When asked about a statement that he gave to Detective Herbert, he replied "[n]othing in here ain't true." When further questioned if his statement was true, Cepeda answered that he had been lying. *Id.* at 123. When Cepeda was asked if he had identified the Defendant in a photo array he denied that he

had done so. The Prosecutor tried to confirm that Cepeda had signed a statement identifying the Defendant. He responded that he could not read, so he could not verify the truth of the statement. *Id.* at 122-123.

Detective Karen Stout, Firearms Supervisor for the District of St. Croix, introduced an Absence of Entry Form, as People's Ex. No. 6. This form established that the Defendant did not have a license to possess a firearm in the Virgin Islands. Trial Tr. vol. 3, 80-84, Mar. 10, 2010. Detective Herbert, as the principal detective, testified to what he learned at the hospital the night of the incident, including that Christian Soto, III was pronounced dead from gunshot injuries. People's Ex. No. 5 — Autopsy Report documenting two (2) gunshot wounds to the head; People's Ex. No. 5A — Certificate of Death. Detective Herbert further testified that W.J. was wounded in his back. People's Ex. No. 3, p. 4 — Photograph of W.J.'s bandaged wound.

Maurice Cooper (Cooper), a forensic science consultant for the Virgin Islands Government, testified regarding the discharged cartridges found at the scene. Defense Counsel did not object to Cooper being qualified as an expert in the field of firearms and firearm examination. He said that he had worked in this field for over twenty-five (25) years. Cooper testified that two (2) spent casings where recovered from the scene. In his report, Cooper wrote that the casings were fired from a Smith and Wesson handgun. He was able to make the determination based on the markings, called "striae," that were imprinted on the casings that both casings were fired from the same firearm.[3] Trial Tr. vol. 3, 91-97, Mar. 10, 2010; People's Ex. No. 8.

Over defense objection, Agent Drummond testified to a series of interviews that he had with Knowles. Agent Drummond, an FBI Agent for twelve (12) years, had been stationed in the Virgin Islands for four (4) years. He came into contact with Knowles because another FBI Agent had been staying at Hotel on the Cay, and Knowles asked to speak with an FBI agent about Soto's homicide. *Id.* at 158-159. They arranged to meet at her job at Hotel on the Cay. The conversation took place in the lobby of the hotel. *Id.* at 159-161. Detective Herbert accompanied Agent Drummond in conducting the interview, which lasted approximately an hour and a

---

[3] Defense Counsel chose not to question the qualification of Cooper, but did object to the report being admitted into evidence, an objection this Court overruled. Trial Tr. vol. 3. 97-102, Mar. 10, 2010.

half. Agent Drummond then reduced the conversation to writing in a "302," an FBI report, marked as People's Ex. No. 25. *Id.* at 163. However, the statement was ruled inadmissible by the Court and further questioning of the witness was not allowed. *Id.* at 164-167. The ruling by the Court essentially sustained Defendant's objection that the testimony did not clearly establish that Knowles had "adopted" the Agent's written statement.

Detective Herbert, the case agent, testified at different times throughout the trial. He described the photo array presented to Dooly during the investigation, He stated that six (6) photographs were shown to Dooly on September 8, 2008, who then was asked if the perpetrator was among the images, Dooly identified the Defendant, Colly Cascen, as the shooter from the photo array. On cross-examination, Detective Herbert also testified that he showed the photo array to Cepeda, who also identified the Defendant as the shooter. *Id.* at 10-13, Cepeda's statement and his identification of the Defendant in the photo array were admitted into evidence as People's Ex. Nos. 14 and 24, respectively. He further reported that Cepeda, while describing the shooting, indicated that Cascen was not shooting at "Papa" (Soto), but instead was after Din Din. *Id.* at 152. Defense Counsel repeatedly questioned Detective Herbert's testimony, particularly about Dooly and the photo array. Trial Tr. vol. 3, 16-22, Mar. 11, 2010. Detective Herbert testified that in completing the arrest form he asked the Defendant if he was right or left-handed and Defendant replied that he was left-handed. He recorded this information on the arrest form. Trial Tr. vol. 4, 14, Mar. 12, 2010.

Estelita Davis, a friend of the decedent's mother, was called by the defense. She said she had attended the races and later that night she was called by one of her daughters to go to the hospital because Soto had been shot. When Davis arrived at the hospital she met Dooly, who was standing by the emergency door. As she approached him she asked, "Dooly, what happen? He said Papa get shot. So [she] said what the 'F'." Davis then called Roxanne, the decedent's mother. While she was still on that phone call Davis was approached by Knowles who she said identified the shooter as "Dave from La Grange." *Id.* at 79-82.

## II. STANDARD OF REVIEW

### A. Juror Disqualification Due To Bias

■ When a defendant asserts a general Sixth Amendment challenge as to the partiality of a jury based upon circumstances occurring outside of *voir dire*, "the remedy . . . is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78, (1982); *see also Fitzgerald v. Greene*, 150 F.3d 357, 364 (4th Cir. 1998). However, because "a convicted defendant should not be allowed to waste the time of a [trial] judge or inconvenience jurors merely to conduct a fishing expedition," a hearing is necessary only when reasonable grounds exist to believe that the jury may have been exposed to an extraneous influence. *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978); *United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984) ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."); *United States v. Barber*, 668 F.2d 778, 787 (4th Cir. 1982) ("[S]omething more than such an unverified conjecture [of juror bias] is required to justify grant of a new trial.").

### B. Motion for Judgment of Acquittal

■ The Superior Court considers a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Specifically, "[w]hen the Superior Court considers a motion for judgment of acquittal, it views the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Stevens v. People of the Virgin Islands*, 52 V.I. 294, 304 (Sup. Ct. 2009) (citations and internal quotation marks omitted). In *United States v. Iafelice*, the Court stated that the trial court

> [M]ust view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the [People], to support it. 978 F.2d 92, 94 (3d Cir. 1992) (internal citation omitted).

Consequently, "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002). Further, "[o]nly when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may [the court] overturn the verdict." *Gov't of Virgin the Islands v. Baron*, 48 V.I. 88, 95 (Super. Ct. 2006) (citing *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997)). Additionally, "[s]trict deference [must] be accorded the jury's findings; the court does, not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *United States v. De Miranda*, Crim. No. 2008-20, 2008 U.S. Dist. LEXIS 104621, at *2 (D.V.I. 2008) (quoting *United States v. Charles*, 949 F. Supp. 365, 367, 35 V.I. 306 (D.V.I. 1996)). It therefore follows that a defendant bears a heavy burden when challenging the sufficiency of the evidence. *See Anderson*, 108 F.3d at 481.

## C. Motion for New Trial

■ Superior Court Rule 135 governs a motion for a new trial. "The Court may grant a new trial to a defendant if required in the interest of justice." SUPER. CT. R. 135. "The decision whether to grant a new trial is in the trial court's sound discretion." *Gov't of the Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1184 (D.V.I. 1989) (citations omitted). "The Superior Court plays a much more active role in considering a motion for a new trial based on the argument that the jury's verdict was against the weight of the evidence." *Stevens*, 52 V.I. 294, at 304. Notably, "a court must weigh the evidence rather than examine its sufficiency and in doing so, it may weigh the credibility of witnesses." *People of Virgin Islands v. Ward*, 52 V.I. 71, 85 (D.V.I. Aug. 5, 2009). "If after weighing the evidence, the court determines that there has been a miscarriage of justice, the court may grant a new trial, and if trial error had a substantial influence on the verdict, the court must grant a new trial." *Ward*, 52 V.I. at 81; *accord Stevens, supra* at 304 (citing *United States v. Silveus*, 542 F.3d 993, 1004-05, 50 V.I. 1101 (3d Cir. 2008)). ("[E]ven if [the Superior Court] believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted").

■ The Court, however, is not required to sit as the thirteenth juror. *See Stevens, supra* at 306 (holding no abuse of discretion when Superior

Court failed to act as a thirteenth juror). "The Court may exercise its discretion to order a new trial if it finds that the evidence preponderates heavily against the verdict; however, such exercise of discretion is to be used only in exceptional circumstances." *Gov't of the Virgin Islands v. Davis*, 35 V.I. 72, 85 (Terr. Ct. 1997) (citing *Gov't the Virgin Islands v. Leycock*, 19 V.I. 59, 62 (D.V.I. 1982)). "It is well settled that in passing on a motion for a new trial, the [trial] court's role is to weigh the evidence rather than examine its sufficiency and in doing so may weigh the credibility of witnesses." *Virgin Islands v. Browne*, 54 V.I. 61, 72 (Super. Ct. 2010) (quoting *Davis*, at 85).

## D. Prosecutorial Misconduct

■ The standard for prosecutorial misconduct is best set forth by the Third Circuit Court of Appeals in the case of *United States v. Lee*:

> A prosecutor's statements before a jury can create reversible error if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." . . . "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." Moreover, [a court] "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." . . . "If the error is non-constitutional, we will affirm when it is highly probable that the error did not contribute to the judgment." 612 F.3d 170, 194 (3d Cir. 2010) (internal citations omitted).

## III. DISCUSSION

### A. The Government Met Its Burden In Proving That Defendant Committed The Offenses Charged

■ The People produced several witnesses to prove their case against Defendant, the lead witness being Dooly. As stated more fully above, Dooly testified to being at the scene, seeing Defendant at close range with a gun, and seeing Defendant fire the gun that killed his son and wounded two other victims. Other witnesses for the People, and several exhibits,

corroborated their account of the shooting sufficiently that the twelve (12) member jury returned a unanimous verdict of guilty on all counts.

■ As stated above, this Court must "view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *Stevens*, 52 V.I. at 304. Thus, Defendant must prove that the "record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt" for this Court to overturn the jury's verdict. *Baron*, 48 V.I. at 95. Furthermore, the evidence, viewed in the light most favorable to the prosecution, demonstrated that the shooting was willful, deliberate, and premeditated. Defendant has failed to meet the standard of *Baron*, and so this Court finds that this Jury could and did reasonably reach verdicts of guilty.

### B. The Court Did Not Constructively Amend The Information.

On March 8, 2010 the Court conducted a pre-trial conference regarding the Second Amended Information which consisted of seven (7) counts. Defense Counsel began the conference by making a motion describing the multiplicitous nature of two (2) of the charges. The Defense Counsel stated:

> A multiplicitous count charges a single offense in two counts and here you have the one count of firing the shot and killing Mr. Soto, Murder in the First Degree, as he is charged; and then you have Count three charging that same act of firing a shot, allegedly firing the shot and killing Mr. Soto as Assault in the First Degree. Trial Tr. vol. 1, 5, Mar. 8, 2010.

The People argued that the counts should stand based on the case of *George v. Sively*, 254 F.3d 438, 43 V.I. 351 (2001). The Court took the decision under advisement in order to review the case that the Prosecution cited in support of the two (2) charges to which the Defendant objected.[4] However, the Court ended the discussion with this comment: "it is

---

[4] The *George v. Sively* case relied on by the People in its opposition to Defendant's motion to dismiss the Assault First Degree charge in relation to Soto's death was irrelevant on the issue of multiplicity of charges. Moreover, a ruling on Defendant's objection to the People's Second Amended Information was obviated by the Third Amended Information.

seemingly a duplicitous count of murder and assault."[5] Trial Tr. vol. 1, 11, Mar. 8, 2010.

 While Defendant claims that this Court assisted the Prosecution in constructively amending the Information, Defendant neglects several key points. Primarily, this Court did not have any conversation with the People on this matter where it instructed the People on how to amend the Information.[6] Furthermore, the bar on constructive amendments pertains to criminal indictments by grand juries. *See United States v. Lee*, 359 F.3d 194, *see also United States v. Syme*, 276 F.3d 131. The charges against Defendant were filed via an Information, not by a grand jury indictment (which in this jurisdiction is done only in the District Court). Finally, the reason constructive amendment is prohibited is because it prejudices the defendant by "*broadening the possible bases for conviction from* [the charges voted on by the grand jury] which appeared in the indictment." *Lee, supra* at 208 (quoting *United States v. Asher*, 854 F.2d 1483 (3rd Cir. 1998)) (emphasis original). There was no broadening of the bases for conviction in this case, but rather, a charge was *removed* from the information and a lesser charge was substituted in Count Four (4), thereby *narrowing* the bases for conviction. Claiming prejudice to the Defendant in this instance does not comport either with law or common sense. Whatever motivated the People to amend the Information to the six (6) charges on which the Jury convicted the Defendant, it assented to the Defendant's objection and accrued to his benefit.

### C. Defendant Was Properly Convicted By An Impartial Jury

There were three (3) instances involving jurors that occurred during the six (6) days of trial which led the Defense to ask that jurors be removed or to request a mistrial. After arguments by counsel for both sides in the first incident, reviewing the circumstances, inquiring of all the jurors in the second incident and two (2) jurors in the third incident, the Court denied the motions.

---

[5] The Court was incorrect by saying "duplicitous" rather than multiplicitous, but it is clear that the discussion was about the Defendant's objection to the two (2) counts in the Second Amended Information charging the Defendant with killing the deceased in two (2) counts, namely, Murder First Degree and Assault First Degree. Moreover, charging Murder First Degree and Assault First Degree is illogical when the victim died as a result of the assault.

[6] Affidavit by Court attached as Exhibit 1.

The first event happened on the first day of trial testimony. During cross-examination of the decedent's father, Dooly, Defense Counsel asked a second question while the witness was responding to the previous inquiry. The Court admonished Counsel to allow the witness to, respond. Simultaneously, a Juror (later identified as Juror number seven (7)) blurted out, "Yes, thank you" (according to the Court Reporter). Trial Tr. vol. 2, 115, Mar. 9, 2010.

After a brief sidebar conference the Court adjourned the trial and held a conference in Chambers. Trial Tr. vol. 2, 115-127, Mar. 9, 2010. Counsel for the defense then argued that the Juror's audible comment heard by him was "Shut up. Let him answer." He went on to interpret the comment as an expression of bias against his client, requested the Juror's removal from the panel, and moved for a mistrial. Both prosecutors and the Court stated that they did not hear the words spoken by the Juror. In his post-Trial filing of May 19, 2011, Defense Counsel quotes Juror No. 7 as saying: "leave him alone, let him answer how he wants to," further expanding his in-Chambers quotation. Def.'s Supp. M.J. Acquittal Or. Alternative, M. New Trial pp. 4-5. The Court noted that it was clear that Defense Counsel had been decidedly aggressive in his examination of this witness and that Counsel was badgering the witness by both his tone of voice and interrupting the witness' response to his previous question. Moreover, the Court discounted the defense assumption of bias against his client because the comment which, unlike Defense Counsel's mistaken recollection, (Shut up, let him answer), was essentially neutral in nature — "Yes, thank you."[7] Taken in the context of the incident, the Juror audibly agreed with the Court's ruling that the witness should be allowed to finish his answer. Trial Tr. vol. 2, 118-127, Mar. 9, 2010. This incident is similar to one analyzed by the Supreme Court of the Virgin Islands in the case of *Ritter v. People of the Virgin Islands*, 51 V.I. 354 (Sup. Ct. 2009). In that case, Defense Counsel argued that Defendant's right to a fair trial was violated when Defense Counsel heard several members "sucking their teeth" and uttering comments, such as "[W]hy you asking that question, how she supposed to know," during Defense Counsel's cross-examination of two of the People's witnesses. *Id* at 371. In the Supreme Court's opinion affirming the conviction, it was noted that:

---

[7] In reviewing this issue the Court accepts the Court Reporter's Transcript as the accurate account of the juror's words.

[T]he allegation of bias stemmed solely from Defense Counsel's interpretation of the jury's reaction to his cross-examination of the People's witnesses. In the absence of any evidence of juror misconduct, it is a more reasonable conclusion that the teeth-sucking and murmurings by the certain jurors were a reaction to Defense Counsel's aggressive questioning of the People's witnesses, as the trial judge opined. *Id.* at 373.

While the Juror's outspoken comment was a deviation from conduct expected of jurors during a trial, it certainly did not rise to a level to merit the sanctions demanded by the Defendant. Regrettably, the foregoing is only the first of several misrepresentations espoused in the Defendant's arguments during the trial and in his post-trial memoranda objecting to the Court's denials of his motions to remove jurors and for mistrials.

The second request for a mistrial was based on an incident that occurred while the Jury was re-entering the courtroom after lunch on the third day of the Trial. Defense Counsel reported to the Court and Prosecutors in a Chambers conference that he observed "the mother of young Mr. Soto, the decedent, was standing to the left of the door where the jury entered, shouting at the top of her lungs, profanity. . . . She was also saying. . . 'They kill my son, I must get justice'. . . [and she is there] shouting at the top of her lungs." Trial Tr. vol. 4, 94-95, Mar. 11, 2010. After a lengthy discussion, the Jury was brought back into the courtroom and the Court questioned the panel about the incident. The Transcript documents the exchange between the Court and the Jury as follows:

> THE COURT: Ladies and gentlemen of the Jury, it's been brought to my attention that on your way into the courtroom today after lunch, there was a lady standing somewhere between this doorway, the entrance and a little further down the hall who was making some loud comments which may have some relation to this case. So I ask you, did any of you hear those comments? It would have been on your way into the courtroom after you came from lunch. If you have, kindly raise your hand. No one heard anything?
> JUROR NUMBER 11: Yeah, I heard her talking, but I didn't understand what she was saying so I came in quickly.
> THE COURT: Anybody heard anything?
> (Jurors responded no.) Trial Tr. vol. 4, 108-109, Mar. 11, 2010.

■ The Court's inquiry made it clear that none of the Jurors heard the comments by the decedent's mother, consequently they were not tainted by her outburst. Based on the trial record, there is no reason to infer — much less find — that any Juror heard the rant voiced by the decedent's mother. Therefore, the Panel's impartiality was not affected. Thus, the Court acted properly under the *Moten* standard in that it determined that there was no need to conduct a hearing away from the Jury. The Court relied upon the Jury Panel's unanimous silence when asked if they had heard what was said by the deceased's mother. Consequently no Juror was exposed to an extraneous influence by this occurrence.[8]

On Friday, March 12, 2010, a note was received from one of the jurors. The Court read the note into the record in a conference in Chambers with the attorneys present:

> Due to the nature of this case, I pay very close attention to my environment. During the hours of nine and eleven o'clock — and [The Court] presume[s] this refers to last night — I observed a black pickup truck parked in front of my house. The vehicle was there for at least three to five minutes. I could not see inside the vehicle because it was tinted. I am not sure if the person was on a phone call, *but I would like you to get this information in case of anything*. Trial Tr. vol. 5,4, Mar. 12, 2010. (Emphasis added.)

The Court asked for comment from each attorney. In response, Defense counsel requested that the Juror be removed. Defense Counsel surmised that if there was any further investigation into the note it would color the deliberations against his client. The People wanted to inquire of the jury if anyone else had received any contact from an outside party. The Court decided that an inquiry was appropriate. Initially, Juror Number 10 was brought in; however, Juror Number 10 was not the one who wrote the note regarding the black truck. Juror Number 11 entered, and she confirmed that she had written the note. The Juror further said that she lived in Estate Smithfield in a bushy area and there is a duplex near to her house. She stated that she observed a black pickup truck parked across the street from her home that morning between three (3) to five (5) minutes and then

---

[8] As a consequence of her attempt to communicate prejudicial statements about the Defendant to the jury, the Court ordered the Marshals to exclude the deceased's mother from the courtroom for the remainder of the Trial.

drove off. She could not tell if the driver was male or female because the vehicle's windows were tinted. When asked if she told any of her fellow jurors, she stated that as she was writing the note, "I told [Juror Number 10, who was seated next to her] I saw a pickup truck parked across the street from the house." Trial Tr. vol. 5, 10, Mar. 11, 2010. The Juror also stated that the driver made no attempt to make contact with her. Before the Juror left the Chambers, the Court inquired of the Attorneys if they wished to ask any questions of the Jurors, but they declined to do so. Trial Tr. vol. 5, 8-13, Mar. 12, 2010.

After the Juror rejoined the Panel, Defense Counsel stated:

> Your Honor, the fact that this Juror thought it was so important to let you know that she saw a black pickup truck in the day so "in case anything happen" indicates to me that the juror has internalized the evidence of fear, which the People of the Virgin Islands have produced in this trial. *Id.* at 13-14.

Defense Counsel then moved for a mistrial. The People objected, stating that there was nothing inappropriate about the note or the statement that the Juror made to the Court. The Court denied Defendant's motions to remove Jurors 10 and 11, as well as Defendant's motion for a mistrial.

■■■ This Court acted in accordance with the requirement of *Smith v. Phillips, supra*, 455 U.S. 209, in conducting a hearing to determine whether there was any bias. This Court is satisfied with Juror Number 11's statement that she "wanted [me] to know that [she] observed a vehicle in front of [her] door" and that the driver did not attempt to contact her. Furthermore, the Court concluded that after the *in camera* hearing, Defense Counsel was unable to show any actual bias on the part of either Juror Number 10 or Juror Number 11, and both were correctly allowed to remain on the jury. Moreover, contrary to Defense Counsel's "quote" by Juror Number 11, "in case anything happen" is not in the Transcript; rather her statement was "in case of anything." Trial Tr. vol. 5, 13-14, Mar. 12, 2010. Defense Counsel's addition of "happen" suggests a sinister connotation to the Juror's actual comment. This Court's assessment of the Juror's report on the truck may have been motivated by the Court's questioning the entire panel about the comments by the decedent's mother. Juror Number 11 was the only one who said that she had heard a person talking but didn't understand what she was saying so

she quickly entered the courtroom. *See* Transcript reference on p. 17 of this Memorandum.

Moreover, Juror 11's statement to the Court and Counsels was that "due to the nature of this case, I pay close attention to my environment." The Defendant's argument that it showed bias toward his client is meritless. The record of crimes in St. Croix is a constant topic in all media. Every resident of this community should be on the alert for and report criminal behavior, which has become a blight on this island. This Juror merely implied the commonly held belief that crime is a reality on St. Croix. Indeed, the final statement of Juror Number 11, that "it might have been a person that was just maybe using their phone," — which was volunteered, not solicited — belies the Defendant's interpretation of bias against him. Her statements do not afford this Defendant any right to remove her from the jury of twelve (12) Virgin Islanders who were selected by the attorneys for the People and the Defendant who exercised their challenges to the jury array after a thorough Voir Dire Examination.

██ ██ Following this ruling, the People renewed their motion for sequestration of the jury, which was initially made before the start of jury selection on March 8, 2010, and was denied as unjustified. Trial Tr., vol. 1, 24-28, Mar. 8, 2010. Defense Counsel argued that sequestration now would prejudice the Jury against his client. Defense Counsel "vociferously opposed" sequestration at each time the motion was made. The Court ultimately granted the motion on the last day of trial. In granting the People's request for sequestration the Court was acutely mindful of the decedent's mother's attempt to prejudice the Jurors against the Defendant. Juror Number 10's account of the truck outside her residence that morning heightened the Court's latent concern that the Jury might be exposed again to improper influences. Accordingly, sequestration was ordered and lasted only one (1) night since the Jury returned a verdict the following day. Thus, the Court complied with long standing jurisprudence allowing a trial court to sequester a jury when it decides that it would be a prudent precaution for security reasons to isolate the Jurors from possible extraneous influence. Trial Tr. vol. 5, 22-23, Mar. 12, 2010. Doing so also serves to protect the Defendant's right to a fair trial. *See Government of the Virgin Islands v. Smalls,* 32 V.I. 157, 173-174 (Terr. Ct. 1995).

The Smalls trial was perhaps the most sensational criminal trial since the Fountain Valley case in 1973. The Defendant was a notorious gang

chieftain and drug dealer whose trial was the subject of daily media attention, Smalls' challenge was not to the sequestration of the jury, but rather asserted that the "failure of the Court to sequester the jury prior to trial," violated his right to a fair trial. *Id.* at 172. Presiding Judge Vern A. Hodge ordered the sequestration on the second day, of trial "after one of the jurors was visited by one of the Defendant's relative[s] after the first day of trial." *Id.* at 173. This Court's sequestration was an extension of this established judicial tradition.

## D. Analysis Of Evidence

The Defense argued to the Jury that there were no fingerprints of the Defendant, or a gun recovered, showing that it was used at the shooting incident by him. Indeed, as the prosecution conceded on closing arguments, there was no forensic evidence connecting the Defendant to these crimes. Essentially, the Jurors' task, then, was primarily to judge the credibility of witnesses who testified before them during the trial. Regarding the Jury's verdicts, this Court will summarize its own impression of the credibility of the evidence presented by the witnesses for each side in this case — both on direct examination and cross-examination.

Undoubtedly, Dooly was the star witness for the prosecution because he, essentially, recreated the incident that resulted in the death of his son, the wounding of the minor W.J. and Cyril Peters. He did so consistently even when cross-examined with expert skill by the Defense Counsel without retreating into emotional responses relating to the murder of his son. While Dooly's testimony — by itself — would have provided a valid basis for the Jury's verdict, all other witnesses for the People (except for Cepeda) provided some corroboration of the deceased victim's father's testimony. He also confirmed his identification of the Defendant as the shooter via the photo array, admitted as People's Ex. No. 10.

The testimony of Knowles, while she initially resisted identifying the Defendant as the shooter, later admitted that she had eventually given this identification to Detective Herbert and in her interviews with FBI Agent Drummond. Knowles' statements to Detective Herbert and Agent Drummond that the Defendant was the shooter, as well as her revelation that there was a feud between Defendant and Peters, gave the Jury a plausible motive for the Defendant's deadly assault on September 7, 2008. The evidence of the Defendant's murderous intent in this shooting

370

incident was ample proof of premeditation, malice, and reckless endangerment.

The Defense evidence consisted principally of three (3) witnesses. Cepeda, on direct examination by the People, completely repudiated the signed statement he gave to Detective Herbert and denied that he had identified the Defendant as the shooter from a photo array. People's Ex. Nos. 14 and 24. On being called as a witness for the Defense, Cepeda introduced another issue into the case, namely, that Dooly offered to pay him two thousand dollars ($2,000.00) if he identified the Defendant as the perpetrator of the two (2) injuries and murder by gunshot on the day in issue. But Cepeda did not say that Dooly offered to pay him himself, rather he said that Dooly's "cousin" who he identified as "the officer right there, he tell me that his cousin. That what he tell me. I not lying. . . He tell me his cousin. And he tell me take the money as soon as I tell he. I not answering he. Me ain't tell he nothing about it." Trial Tr. vol. 4, 116, Mar. 11, 2010. The cousin, according to Cepeda was Detective Herbert, who Cepeda never said offered him nor did he accept any money from him.

However, during cross-examination, Cepeda admitted that he was asked questions by Det. Herbert and that he gave answers and also admitted that he signed his name. Only a few questions later he denied that he gave Herbert answers, The witness stated: "I want to talk. I ain't get no chance to say. I just want to talk my part." *Id.* at 121. His examination ended with his affirming that he had signed his name, but that the statement he gave was not true, but rather he was "lying to [Det. Herbert]." *Id.* at 121-122. It is obvious that the Jury decided that Cepeda's testimony was not credible since his signed statement and his identification of the Defendant were exhibits which contradicted his in-court testimony whether he was testifying as a witness for the People or for the Defense. People's Ex. Nos. 14, 24. The same conclusion was likely reached by the Jury regarding the truthfulness of the Defense witness, Leo Rodriguez, an eyewitness, who denied that he had told Dooly on the night of the shooting that the Defendant had been the shooter.

Finally, Karima Gaskin was called by the defense to testify that she was with the Defendant at the time of the shooting. She said they were together in a car "from nine to eleven" and she responded to Defense Counsel that he did not leave her presence for that period. *Id.* at 143.

While the Jury did get an alibi instruction from the Court as a complete exoneration of all the charges, it is doubtful that they gave this witness any credibility on her alibi testimony, largely, no doubt, because it was lacking in clarity. The witness admitted that she did not know the time that the shooting occurred. Further, she recounted that she was in five (5) different locations on that night, thereby devaluing her attempt to afford the Defendant a solid alibi defense. So, in considering the standard instructions given by the Court that informed the Jurors that they could not convict the Defendant of any of the crimes unless the evidence they heard and saw as exhibits convinced them beyond a reasonable doubt on every element of each of the six (6) charges in the Third Amended Information, the Jurors clearly adopted the People's version of the incident by their verdict.

### E. There Was No Prosecutorial Misconduct In This Case That Justifies Reversal of the Jury's Verdicts

Defendant raises two (2) issues that he claims amount to prosecutorial misconduct sufficient to warrant a new trial. The first dealt with "vouching" for Dooly and the second was the Prosecutor's reference to the Defendant as a "cold blooded murderer" during closing arguments. While it was an unfortunate characterization, this Court believes that the comment did not rise to the level of severity required by *Moore v. Morton*, 255 F.3d 95 (3rd Cir. 2001), to abrogate the verdict. Furthermore, a review of the Transcript of Closing Arguments puts this issue in a different perspective than the Defendant's protest. The primary Prosecutor, in referring to the several persons who were present during the shooting incident, stated:

> Mr. Roberson: . . . All these people were right there at the scene when this happened. How could they not? But they wouldn't come forward. The only person with courage to come in and tell the truth. . .

> Mr. Meade: Objection Judge.

> Mr. Roberson: I'll withdraw that. That's a legitimate objection. I withdraw the statement.

> The Court: Sustained. Trial Tr. vol. 5, 64-65, Mar. 12, 2010.

This exchange is the one Defense Counsel protests as impermissibly vouching for Government's witnesses. However, this statement (which was never completed) was objected to, withdrawn by the People, and sustained by the Court. Accordingly, both the Court and Prosecutor properly dealt with this closing "vouching" statement immediately after it was made. Attorney Roberson then continued his argument and added: ". . . They all know that this defendant is a cold blooded murderer." The Prosecutor finished his closing argument a few sentences later, yet Defense Counsel made no objection to the Prosecutor's calling his client a cold-blooded murderer. Trial Tr. vol. 5, 65, Mar. 12, 2010.

 When asked if he was ready to proceed with his closing argument, Defense Counsel asked to approach the bench. At that sidebar conference, Defense Counsel accused the Prosecutor of crying and requested a mistrial. The Prosecutor was asked, "[d]id you cry?" to which he responded, "I did not." *Id.* at 65-66. While Defense Counsel voiced objections during the People's closing argument, it is undeniable that he did not make an objection to the comment which he now characterizes as fatal prosecutorial misconduct which justifies this Court ordering a new trial. When a Defendant fails to object contemporaneously, the standard of review is for plain error, i.e. an error that affects the Defendant's substantial right to a fair trial. *Murrell v. Virgin Islands*, 54 V.I. 327 (V.I.). This Court finds that the remark, while unfortunate, does not rise to the level of plain error. Therefore, the Court will not grant a new trial based on the above-quoted statement, which, contrary to Defendant's representations, was said only once during the trial.

As to the claim that the Prosecutor inflamed the passion and sympathy of the Jury by crying during closing arguments, this Court did not observe nor hear any such conduct by the Prosecutor, nor is there any evidence of crying in the record. Furthermore, the Prosecutor, when questioned by the Court, denied crying. Trial Tr. vol. 5, 67, Mar. 12, 2010. Without any further evidence, and in light of other misstatements of the trial proceedings by Defense Counsel, both during the trial and in post-trial arguments, this Court cannot find any misconduct relating to this alleged incident.

 After the People proffered the admission of People's Ex. No. 6, Defense Counsel objected only to the admission of page two (2) showing the "absence of entry" of any gun permit issued to the Defendant in the St. Thomas/St. John/Water Island District. The basis of his objection was

that Detective Stout was "not competent" to testify as to both pages of People's Ex. No. 6. The Court overruled his objection and disallowed him to cross-examine Detective Stout regarding her competence based on the Court's ruling that she was competent to testify and confirm the authenticity of the Exhibit as to both Districts.[9] Trial Tr. vol. 3, 77-88, Mar. 10, 2010. This issue of the competence of Detective Stout to testify and offer an exhibit showing that the Defendant was not licensed to possess any firearm in the Territory of the Virgin Islands was raised by Defense Counsel even before she was called as a witness. Trial Tr. Vol. I, 13-14, March 8, 2010. Thus, Defense Counsel's attempt to cross-examine her on her competence to testify was utterly improper since the Court had twice decided that issue as a matter of law. Since all jurors are instructed that on matters of law they must abide by the Court's rulings during trials, trial attorneys who practice before this Court should be acutely aware of this reality.

### F. The Statement Of Cyril Peters Submitted By Defense Counsel Is Inadmissible And Is Insufficient To Justify A New Trial

On May 19, 2010 the Defense submitted an affidavit (dated August 13, 2009) of Cyril Peters in which he exculpates the Defendant as the perpetrator of the crimes committed on September 7, 2008. Stating that he had not been contacted by the Government in regards to the case, the affiant went on to swear that the person responsible for the crime was not the Defendant and that he would not be participating in any case against the Defendant. He also stated that he was afraid to return to St. Croix, because he feared for his life. *See* Attachment to Def.'s Supp. M.J. Acquittal Or, Alternative, M. New Trial. Defense Counsel acknowledges that he was in possession of this statement prior to the start of the trial and that he would offer it as a defense exhibit if he was unable to subpoena Peters. Trial Tr. vol. 19-10, Mar. 8, 2010. During this conference the Court

---

[9] Detective Stout, as the custodian of firearm, records on St. Croix, testified that she personally had confirmed electronically the absence of any gun license for the Defendant in both Districts supported the charge of Possession of an Unlicensed Firearm During the Commission of a Crime of Violence. *See Government of the Virgin Islands v. Gumbs*, 426 Fed. Appx. 90 (3d Cir. 2011) (*citing Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)), *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L. Ed. 2d 314 (2009) (requiring in-court testimony by analysts who performed substance tests to admit laboratory results for drug convictions).

advised counsel that the Probation Division, in an unrelated matter before this Court, had reported — at a hearing "last week" where Peters failed to appear — that Peters had absconded from the Territory. In fact, the Prosecutor affirmed the Court's statement and added that Peters was in phone contact with one of the police detectives, but he refused to identify his location, and the Prosecution consequently was unable to subpoena him for the trial. *Id.* at 6-7. However, Defense Counsel did not even attempt to have this affidavit admitted as evidence.

The reason for this failure to try and introduce the statement is obvious. Such a statement would be in violation of the Federal Rules of Evidence and the Uniform Rules of Evidence, as it would be unfairly prejudicial to the People, since the Prosecution could not cross-examine a document. Furthermore, it is a clear example of hearsay under Federal Rules of Evidence 802 and Uniform Rules of Evidence 802. Thus, the document would never have been admitted had Defense Counsel attempted to introduce it, and it will not be considered at this juncture either.

 On a petition for revocation of his probation set for a hearing on March 4, 2010, Defendant Peters did not appear. Peters' Probation Officer reported to the Court that the Defendant had been approved to relocate to St. Thomas. He also said that Peters had avoided reporting to the Probation Office, had returned to St. Croix without permission, and had absconded from this jurisdiction and was likely residing outside the Virgin Islands. This Court issued an arrest warrant which to date has not been executed.[10] Thus, the Defendant is now requesting that this Court nullify the Jury's verdicts based on an affidavit by a fugitive from justice. Consequently, this Court rejects this flagrantly objectionable maneuver to obtain a new trial.

### G. The Court Did Not Err In Allowing Dr. Lloyd Henry's Testimony

 The Defendant also objected to Dr. Lloyd Henry (Dr. Henry) being allowed to give opinion testimony about Peters' survival prospects after being shot. Dr. Henry, called by the People, identified himself as a surgeon who was a licensed physician in the Virgin Islands since 1970. He

---

[10] Transcript of proceedings in the above-referenced case (People v. Cyril Peters SX-06-CR-186) is attached as Court's Exhibit 2.

confirmed that he had an arrangement with the Juan Luis Hospital to be on call in the event that a patient required emergency surgery. On September 7, 2008, he was summoned to the hospital to attend to a patient, Cryil Peters, who had been shot several times. He diagnosed that the injuries to Peters' abdomen were life threatening because the bullets had severed arteries and his colon, producing severe bleeding and releasing food and feces in his stomach. The following transcript, reference encapsulates the physician's testimony:

> Q (Mr. Evans) If left untreated, what would have happened to Cyril Peters?
>
> A He would have died.
>
> Q Thank you.
>
> THE COURT: What do you base that on?
>
> THE WITNESS: The injury to the abdomen involved multiple wounds to the small intestine. There was also a wound to the large intestine. There was a spillage of food and feces in the abdominal cavity. There was also a significant amount of blood, somewhat over a liter of blood, in the abdominal cavity. There was active bleeding from the arteries that were feeding the small intestine and with this combination, nobody would have survived without proper treatment. Trial Tr. vol 4, 12, Mar. 11, 2010.

Defendant claims that since Dr. Henry was not qualified as an expert, he should not be allowed to give opinion testimony. However, this is a misstatement of the law. Under the Uniform Rules of Evidence, the court must apply V.I. CODE ANN. tit. 5 § 911:

> If the witness is not testifying as an expert his testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clear understanding of his testimony or the determination of a fact in issue.

In this case, the Court allowed the testimony over Defendant's objection because Dr. Henry was the surgeon who operated on Peters, and was testifying to his observations at the time of the surgery. This testimony was clearly relevant to the determination of a central fact in issue, specifically, whether Defendant was guilty of Attempted Murder or Assault 1st Degree

376

as to Peters. Furthermore, as stated in *Mulley v. People of the Virgin Islands*, it is not necessary for the Court to make the determination of whether the statements of Dr. Henry rose to the level of expert testimony because no error would have occurred had the People had him testify as an expert witness. 51 V.I. 404, 418 (Sup. Ct. 2009). As in *Mulley*, Defendant is not arguing that the Court "could not have made the requisite findings to qualify [Dr. Henry] as an expert." Consequently, the Court is allowed to "implicitly [make] the findings necessary to qualify [Dr. Henry] as an expert in the event that such qualification was a necessary prerequisite to admissibility." *Id.*[11] In *Mulley*, our Supreme Court approved the admission of a police detective's opinion on the trajectory of a bullet absent his qualification as an expert on the specific subject. Accordingly, Dr. Henry's succinct but explicit explanation of his opinion on his patient's life threatening gunshot injuries was both proper and appropriate. Thus, the Court did not err in allowing Dr. Henry's testimony which addressed a crucial factual determination to be made by the Jury.

▪ The Supreme Court's Opinion in *Mulley* also supports the verdict rendered by this Jury on the charges of Reckless Endangerment and Possession of an Unlicensed Firearm During the Commission of a Crime Of Violence. The factual circumstances of the shooting incident in this case — several people gathered together in a public place for the purpose of innocent celebration — is not far removed from Mulley's firing shots at a school bus on a public road in the vicinity of the airport in St. Thomas. Mulley was convicted of Attempted Murder First Degree and Assault First Degree of the driver of a school bus, who apparently was the only occupant at the time, and like the Defendant herein, found guilty of Reckless Endangerment and Possession of an Unlicensed Firearm During the Commission of a Crime Of Violence.

The *Mulley* decision also held that remarks by the prosecutor, condemned as improper vouching for the victim's testimony and unrelated to the evidence, did not amount to plain error requiring reversal. Specifically, because the trial court correctly instructed the jury, as this Court did in its instructions in this case as follows:

---

[11] While the Supreme Court in *Mulley* analyzed the facts under V.I. CODE ANN. tit. 5 § 911, it also noted that there is no practical distinction between the Virgin Islands Code and Federal Rules of Evidence 701 on this issue.

377

> [S]tatements and arguments of counsel are not evidence. Trial Tr. vol. 5, 102, Mar. 12, 2010.
>
> The evidence on which you are to decide what the facts are consist of the sworn testimony of witnesses, both on direct and cross-examination, regardless of who called a witness; and the exhibits received in evidence. *Id.* at 103
>
> The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls. *Id.* at 102-103.

The *Mulley* Court also cited a D.C. Circuit Court case that held that "courts have described the evidence against a defendant as 'overwhelming' when the crimes alleged put the defendant 'in the continuous view of witnesses' who are able to identify the defendant at trial." *United States v. Reed,* 522 F.3d 354, 360, 380 U.S. App. D.C. 329 (D.C. Cir 2008).

On March 9, 2010, the Twenty-Eighth Legislature passed Act No. 7161 which, among other amendments, adopted the use of the Federal Rules of Evidence in Superior Court proceedings rather than the Uniform Rules of Evidence. The Governor signed the Act into law in April. Since this trial began on Monday, March 8, 2010 and ended with the Jury's verdict on Saturday, March 13, 2010, this Court has applied the Uniform Rules of Evidence in making the last two (2) evidentiary rulings. However, these decisions would have been the same under the Federal Rules of Evidence, which now by legislative fiat are used in this Territory's trial court.

On page thirteen (13) of his post-trial Memorandum, Defendant claims that a "Juror slept for a substantial period of time during the presentation of evidence. That fact was brought to the court's attention by one of the Marshals." Def.'s Supp. M. J. Acquittal Or, Alternative, M. New Trial p. 13. The Court noted no such somnolence by any juror, nor has Defendant provided any evidence of his assertion that it was "brought to the court's attention." Accordingly, this Court rejects this allegation of juror misconduct as support of his request for a mistrial.

Lastly, Defendant asserts that "Jurors number 1, 7 and 8 would turn away from the witness during cross-examination by Cascen and [would]

make utterances of disgust whenever Cascen objected to evidence or testimony." Def.'s M. J. Acquittal Or, Alternative, M. New Trial p. 5. The Defendant's premise is that his observation was evidence that the "jurors became partial toward the Government." The Court's response is best expressed in the Supreme Court opinion in *Ritter*, 51 V.I. 354 quoted at page sixteen (16) of this Memorandum Opinion. Since the Judge and Jury faced each other throughout the Trial, the Court does not agree with this allegation by Defense Counsel. The Court did not notice such behavior, and as a consequence, this Court doubts the veracity of Defense Counsel's statement. But more importantly, even awarding his observations some credit, they still do not justify his unrelenting and dubious claims of Jury bias against his client based entirely on his personal, perhaps biased, perceptions. The case precedents cited in this Memorandum Opinion on that specific legal issue refute the Defendant's attack on the impartiality of this Jury.

## IV. CONCLUSION

The Court finds that Defendant has not proved any bias on the part of any Juror or any actionable misconduct on the part of the People or reversible errors by this Court. Moreover, the Defendant has not demonstrated any basis in law or in the Record for a judgment of acquittal or for a new trial. A separate Order of even date will be issued in conformity with these findings.